[866 NE2d 1020, 834 NYS2d 692]

HIGHLAND CAPITAL MANAGEMENT LP, Appellant-Respondent, v
LEONARD SCHNEIDER et al., Respondents-Appellants and
Third-Party-Plaintiffs, and JENKENS & GILCHRIST PARKER
CHAPIN LLP, Respondent. RBC DOMINION SECURITIES CORP.,
Third-Party Defendant-Respondent.

Argued February 14, 2007; decided April 3, 2007

**POINTS OF COUNSEL**

*Troutman Sanders LLP,* New York City (*Katherine C. Ash* and *Alvin M. Stein* of counsel), for respondents-appellants. I. The Schneiders' notes are not "securities" and any alleged oral agreement for their sale is covered by the statute of frauds at UCC 1-206 (1). (*Federal Deposit Ins. Corp. v Herald Sq. Fabrics Corp.,* 81 AD2d 168; *Parma Tile Mosaic & Marble Co. v Estate of Short,* 87 NY2d 524; *Morris Cohon & Co. v Russell,* 23 NY2d 569; *State of New York v Patricia II.,* 6 NY3d 160; *Van Amerogen v Donnini,* 78 NY2d 880; *Vigilant Ins. Co. of Am. v Housing Auth. of City of El Paso, Tex.,* 87 NY2d 36; *Graham v Commissioner of Internal Revenue,* 304 F2d 707; *Gerard v Helvering,* 120 F2d 235; *Rangolan v County of Nassau,* 96 NY2d 42; *Abood v Hospital Ambulance Serv.,* 30 NY2d 295.) II. The legislative history belies the contention that the securities industry is to be unburdened from compliance with the statute of frauds. III. Highland Capital Management LP proffers no valid grounds for excluding the Schneiders' notes from the application of UCC 1-206 (1). (*ALH Props. Ten v 306-100th St. Owners Corp.,* 191 AD2d 1, 86 NY2d 643; *Horn & Hardart Co. v Pillsbury Co.,* 703 F Supp 1062, 888 F2d 8; *Corporacion Venezolana de Fomento v Vintero Sales Corp.,* 452 F Supp 1108, 607 F2d 994; *Cohn, Ivers & Co. v Gross,* 56 Misc 2d 491; *Allegaert v Chemical Bank,* 657 F2d 495; *Dairyland Fin. Corp. v Federal Intermediate Credit Bank of St. Paul,* 852 F2d 242; *Lazard Freres & Co. v Protective Life Ins. Co.,* 108 F3d 1531, 522 US 864; *Matter of Waldstein,* 160 Misc 763; *Baker v Gotz,* 387 F Supp 1381.)

*Lackey Hershman, L.L.P.* (*Paul B. Lackey* and *Jamie R. Welton* of the Texas bar, admitted pro hac vice, of counsel), for appellant-respondent. I. UCC 8-102 (a) (15) should be construed

liberally to encompass the notes. (*ALH Props. Ten v 306-100th St. Owners Corp.*, 191 AD2d 1.) II. The notes are transferable. III. The notes are divisible. (*Allegaert v Chemical Bank*, 657 F2d 495; *Baker v Gotz*, 387 F Supp 1381.) IV. The notes are considered "securities" by the market. (*Allegaert v Chemical Bank*, 657 F2d 495; *Vigilant Ins. Co. of Am. v Housing Auth. of City of El Paso, Tex.*, 87 NY2d 36; *ALH Props. Ten v 306-100th St. Owners Corp.*, 191 AD2d 1; *Matter of Waldstein*, 160 Misc 763; *Lazard Freres & Co. v Protective Life Ins. Co.*, 108 F3d 1531; *Morris Cohon & Co. v Russell*, 23 NY2d 569.)

### OPINION OF THE COURT

READ, J.

The United States Court of Appeals for the Second Circuit has asked us whether the eight promissory notes at issue in this case are "securities" within the meaning of section 8-102 (a) (15) of the Uniform Commercial Code. For the reasons that follow, we conclude that they are.

## I.

In April 1998, Norton McNaughton, Inc. (subsequently, McNaughton Apparel Group, Inc.) acquired two women's apparel companies—Jeri-Jo Knitwear Inc. (owned by Leonard Schneider), and Jamie Scott, Inc. (owned by his three children, Leslie, Susan and Scott Schneider). These two businesses were combined to form a division of McNaughton called Jeri-Jo Knitwear, Inc. (Jeri-Jo). Under the terms of the Agreement of Purchase and Sale, McNaughton paid the Schneiders $55 million in cash, assumed $10.9 million in debt, and agreed to a future earn-out payment based on Jeri-Jo's performance over the two-year period ending in June 2000, during which the Schneider children managed this business for McNaughton.[1]

The earn-out payment was fixed at $190 million, which the Agreement called for McNaughton to pay to the Schneiders in cash or, at McNaughton's option, up to 50% in common stock. In light of available cash flow, however, McNaughton was only able to make the minimum cash payment, and wished to avoid the significant dilutive effect on earnings of paying the balance

---

1. Earn-out provisions in merger-and-acquisition agreements are intended to accommodate the seller's desire for compensation for the anticipated future value of the transferred assets and the buyer's reciprocal desire to avoid overpaying for potential, but as yet unrealized, value. In this case, the earn-out was based on Jeri-Jo's profitability, not its sales.

in stock. As an alternative, McNaughton proposed issuing the Schneiders a three-year note secured solely by the face value of the stock to which they were entitled. Ultimately, McNaughton and the Schneiders compromised, agreeing to retire the earnout obligation as of August 29, 2000 for $161 million, consisting of $125 million in cash ($95 million to be paid immediately and $30 million to be paid on or before November 30, 2000, subject to financing); two million shares of common stock at $13 per share ($26 million); and four three-year subordinated promissory notes with a combined face value of $10 million. They also agreed that if financing could not be arranged for the $30 million cash payment, McNaughton would pay the Schneiders $59 million in a combination of cash, unsecured subordinated notes and/or shares of common stock at McNaughton's option.

In October 2000, McNaughton's chief executive officer informed the Schneiders that, given McNaughton's stock price, the company was unlikely to raise the additional equity needed to fund the $30 million payment fast coming due. He asked the Schneiders to extend the November 30th deadline to April 30, 2001. In the end, the Schneiders declined this request and, on December 10, 2000, four three-year subordinated promissory notes with an overall face value of $59 million were issued to them in lieu of the $30 million cash payment.

The eight notes with an aggregate face value of $69 million (the four issued in August 2000 plus the four issued the following December), running 12 pages apiece, were each payable to one or another of the four Schneiders.[2] The notes required McNaughton to make quarterly principal and monthly interest payments to the named payee. McNaughton was designated the maker of the notes, each of which bore the following restrictive legend: "THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. IT MAY NOT BE TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT OR AN OPINION OF COUNSEL TO THE MAKER THAT SUCH

---

**2.** Specifically, the subordinated promissory notes issued and dated August 29, 2000 were payable to Leonard Schneider in the amount of $4 million; Leslie Schneider in the amount of $2.4 million; Scott Schneider in the amount of $1.2 million; and Susan Schneider in the amount of $2.4 million. The subordinated promissory notes issued December 10, 2000 and dated December 1, 2000 were payable to Leonard Schneider in the amount of $23.6 million; Leslie Schneider in the amount of $14.16 million; Scott Schneider in the amount of $7.08 million; and Susan Schneider in the amount of $14.16 million.

REGISTRATION IS NOT REQUIRED." Each note was marked "SUBORDINATED PROMISSORY NOTE" on its face because these notes were subordinate to McNaughton's existing bank and bond debt amounting to roughly $350 million. Upon McNaughton's default, the payee had the right to declare the entire amount under the note due and owing, and to elect either to receive payment in stock or to accelerate payment. The notes stated that they were "governed by and construed in accordance with" New York law.

The securities industry professionals who subsequently dealt with the notes considered them to be high-risk debt akin to junk bonds. Consequently, it was anticipated that any potential purchaser would expect a high yield or internal rate of return. Concomitantly, the notes carried a substantial, variable interest rate (initially, 9.34% on the December notes).

As it turned out, McNaughton was acquired in June 2001 by Jones Apparel Group, Inc. As a result of the merger (an "Event of Default" under the terms of the notes), Jones redeemed the notes at par value, paying the Schneiders $69 million plus interest through June 19, 2001. The parties to this litigation dispute whether the Schneiders reneged on an oral agreement to sell seven of the eight notes when they learned of the planned acquisition before it was announced to the public. In particular, Highland Capital Management LP alleges that the Schneiders, through their agent and broker, Glen Rauch of Glen Rauch Securities, Inc., retained RBC Dominion Securities Corporation (now RBC Capital Markets Corporation) to market the notes on their behalf, and that on March 14, 2001, RBC purchased the notes from the Schneiders for 51 cents on the dollar, and then immediately resold seven of the eight notes to Highland for 52.5 cents on the dollar.[3]

On October 18, 2001, Highland brought this suit against the Schneiders in Texas state court. The action was removed to federal court in Texas on diversity grounds, and then transferred to the United States District Court for the Southern District of New York. As relevant here, the complaint alleges that the Schneiders breached an oral agreement to sell the notes to Highland or, alternatively, breached a binding preliminary agreement to do so, or breached an agreement to sell the notes to

---

**3.** Highland alleges that RBC resold the remaining note to Fidelity Management and Research Company, also on March 14, 2001 and for 52.5 cents on the dollar.

RBC, of which Highland was a third-party beneficiary.[4] The Schneiders answered, denying they had ever agreed to sell the notes to anyone on March 14, 2001 at any price, and asserting that any such oral agreement would have been unenforceable anyway since it fell within the statute of frauds. After the close of discovery, the Schneiders moved for summary judgment to dismiss the complaint.

The Uniform Commercial Code generally bars enforcement of purported agreements to sell personal property in excess of $5,000 unless "there is some writing which indicates that a contract for sale has been made between the parties at a defined or stated price, reasonably identifies the subject matter, and is signed by the party against whom enforcement is sought or by his authorized agent" (UCC 1-206 [1]). In considering the Schneiders' statute-of-frauds defense, the District Judge observed that the statute does not apply to a contract for the sale or purchase of a "security" (UCC 8-113) (*Highland Capital Mgt., L.P. v Schneider*, 2005 WL 1765711, *13, 2005 US Dist LEXIS 14912, *43 [SD NY, July 26, 2005], quoting *Wharf [Holdings] Ltd. v United Int'l Holdings, Inc.*, 532 US 588, 595 [2001] ["Oral contracts for the sale of securities are sufficiently common that the Uniform Commercial Code and statutes of frauds in every State now consider them enforceable"]). He concluded, however, that the seven promissory notes were not securities for purposes of article 8 of the Uniform Commercial Code, because they were not transferrable within the meaning of section 8-102 (a) (15) (i).

The District Judge dismissed Highland's two breach-of-contract claims against the Schneiders on the merits. Although he found an issue of material fact with respect to Highland's claim to be a third-party beneficiary of a contract between the Schneiders and RBC, the District Judge dismissed this cause of action for lack of subject matter jurisdiction. He reasoned that since the underlying oral agreement, even if proven, would only be enforceable up to $5,000 because of the statute of frauds, the claim fell short of the $75,000 statutory threshold for diversity jurisdiction. Highland appealed.

---

4. RBC intended to act as a "riskless principal." That is, RBC sought to eliminate its risk for variable market conditions by obtaining commitments to a specified price from both the seller (here, 51 cents on the dollar) and the ultimate buyer (here, 52.5 cents on the dollar from two buyers) before executing a trade with the seller. RBC's compensation on the transaction would have been the spread between these two prices.

"Given the dearth of caselaw on what constitutes a security under the New York version of [article 8] of the New York U.C.C., and the manifest significance of the determination," the Second Circuit retained jurisdiction over Highland's three contract-based claims, and certified the following question to us: "Based on this record, do the eight promissory notes issued by McNaughton Apparel Group, Inc. to the Schneiders fall within the definition of a security as contemplated by Section 8-102 [(a)] (15) of the New York Uniform Commercial Code?" (*Highland Capital Mgt. LP v Schneider*, 460 F3d 308, 322 [2d Cir 2006] [internal quotation marks omitted].) We answer that question in the affirmative.

## II.

The Uniform Commercial Code defines "security" at section 8-102 (a) (15) as

> "an obligation of an issuer or a share, participation, or other interest in an issuer or in property or an enterprise of an issuer:

> "(i) which is represented by a security certificate in bearer or registered form, or the transfer of which may be registered upon books maintained for that purpose by or on behalf of the issuer;

> "(ii) which is one of a class or series or by its terms is divisible into a class or series of shares, participations, interests, or obligations; and

> "(iii) which:

> "(A) is, or is of a type, dealt in or traded on securities exchanges or securities markets; or

> "(B) is a medium for investment and by its terms expressly provides that it is a security governed by this Article."

Thus, the promissory notes must fulfill the requirements of subparagraphs (i) (the transferability test), (ii) (the divisibility test) and (iii) (the functional test) of section 8-102 (a) (15) in order to qualify as a security for purposes of article 8 (*see generally* UCC 8-102, Comment 15; 7A Hawkland and Rogers UCC Series § 8-102:01 [rev art 8]; *see also*, Report on Proposed Revisions to Article 8, made to Assn of Bar of City of NY as prepared by Comms on Uniform State Laws and Banking Law, Bill

Jacket, L 1997, ch 566, at 65 [" 'Security' as defined in Revised Section 8-102 (a) (15) . . . includes . . . any other obligation of the issuer . . . that is transferable, divisible, and is dealt in or traded on securities exchanges"]).

First, we must consider whether the notes are obligations "represented by a security certificate in bearer or registered form." Section 8-102 (a) (4) defines a "certificated security" as "a security that is represented by a certificate," and section 8-102 (a) (16) defines a "security certificate" as "a certificate representing a security." These definitions are, as the Second Circuit observed, somewhat circular, and might refer either to a specialized document like a traditional stock certificate or, more generally, to a paper embodying the underlying intangible inter- est. Of course, the definitions in section 8-102 were deliberately worded by the drafters "in *general terms*, because they must be sufficiently *comprehensive and flexible* to cover the wide variety of investment products that now exist or may develop" (UCC 8-103, Comment 1 [emphasis added]). We see no reason to ac- cept the Schneiders' invitation to read "certificated security" and "security certificate" more narrowly than their plain words suggest. Thus, we interpret these terms to encompass the eight subordinated promissory notes, which are papers that defini- tively embody and evidence the underlying intangible obligation of McNaughton to the Schneiders.

The notes are obviously not in bearer form; therefore, our next inquiry is whether they are in "registered form." In this regard, section 8-102 (a) (13) states that

> " '[r]egistered form', as applied to a certificated se- curity, means a form in which:
>
> "(i) the security certificate specifies a person entitled to the security; and
>
> "(ii) a transfer of the security may be registered upon books maintained for that purpose by or on behalf of the issuer, or the security certificate so states."

Each of the notes specifies one of the four Schneiders as the "person entitled to the security," which satisfies section 8-102 (a) (13) (i). Accordingly, we must next look at whether "a transfer of the security *may be* registered upon books maintained for that purpose by or on behalf of the issuer," as required by section 8-102 (a) (13) (ii) (emphasis added). The Schneiders (and the dissent) argue that in order to fulfill this requirement,

McNaughton must have set up or kept separate and independent transfer books for this purpose at the time it issued the notes. We agree with the Second Circuit, however, "that the proper inquiry is whether the notes *could have been* registered on transfer books maintained by McNaughton, not whether they were registered on transfer books at the time of the litigation" (460 F3d at 314 [discussing identical language in section 8-102 (a) (15) (i)]).

In this regard, the rules in part 4 of article 8 are instructive. Part 4, along with parts 2 and 3, deals with the rights of persons who hold certificates directly, as the Schneiders did here. Section 8-401 sets out the preconditions that trigger the issuer's duty to register a certificated security when it is presented with a request to register a transfer.[5] Thus, the phrase "may be registered" in section 8-102 (a) (13) (ii) refers to whether McNaughton would have been required to register the transfer of the notes to a third party at the Schneiders' request.

We conclude that McNaughton ultimately would have been constrained to do so. McNaughton did not restrict transfer of the notes other than by the legend, as its chief executive officer acknowledged. And the restrictive legend itself suggests that the parties contemplated the possibility of future transfer. As Highland points out, as a practical matter, McNaughton would have to have recorded any transfer of the notes in order to protect itself and the senior debt holders. For example, in the event of default, the payee of the notes could have elected conversion of the principal to common stock, thus diluting other shareholders' value; and because the notes called for hefty payments of principal and interest, McNaughton had to have a way to keep track of the proper payees. Accordingly, we conclude that the notes satisfy the transferability test in UCC 8-102 (a)

---

**5.** These preconditions for certificated securities include whether, under the security's terms, the person seeking registration of transfer is eligible to have the security registered in his name; the indorsement is made by the appropriate person or an agent with actual authority; reasonable assurance is given that the indorsement is genuine and authorized; applicable tax laws have been complied with; the transfer does not violate any restriction on transfer imposed by the issuer against a person with actual knowledge, or constructive knowledge (i.e., any restriction is conspicuously noted on the certificate); there is not in force an effective demand by a registered owner that the issuer not register a transfer; and the transfer is in fact rightful or is to a protected purchaser (*see* UCC 8-401).

(15) (i): they were obligations represented by a security certificate in registered form.[6]

Further, the notes satisfy the divisibility test in section 8-102 (a) (15) (ii). "[M]inimum compliance with this formality requires that there be at least two instruments in a specified class or series, or that the single instrument be divisible into at least one additional instrument" (*Allegaert v Chemical Bank*, 657 F2d 495, 507 [2d Cir 1980] [citation and internal quotation marks omitted]; *see also Baker v Gotz*, 387 F Supp 1381, 1390 [D Del 1975] [where six notes are issued for a total of 25,360,000 Swiss francs, the notes are "patently one of a class or series"] [citation and internal quotation marks omitted]; UCC 8-102, Comment 15 ["The divisibility test of subparagraph (ii) applies to the security—that is, the underlying intangible interest"]). Here, there were eight notes, divided into two groups of four notes each. The eight notes were identified in McNaughton's Form 8-K as a class of obligations, in the same category, in fact, as McNaughton's $12\frac{1}{2}\%$ senior notes, which the Schneiders concede were article 8 securities.

Next, the notes fulfill the functional test in section 8-102 (a) (15) (iii) (A) because these obligations "[were], or [were] of a type, dealt in or traded on securities exchanges or securities markets." This component "provides flexibility while ensuring that the Article 8 rules do not apply to interests or obligations in circumstances so unconnected with the securities markets that parties are unlikely to have thought of the possibility that Article 8 might apply" (UCC 8-102, Comment 15). Tellingly, the many securities industry professionals from Rauch, RBC and Highland who dealt with the notes uniformly treated them as securities. McNaughton's chief executive officer, when he first proposed issuing the notes in lieu of cash or stock, described them as a "form of a convertible subordinated debenture." When McNaughton issued the notes to the Schneiders in August

---

**6.** We note that we are not "[c]onfusing registrability upon transfer books with recording in corporate books generally," as the dissent contends (dissenting op at 420). Rather, we conclude, for the reasons stated, that "the notes *could have been* registered on transfer books maintained by McNaughton" (460 F3d at 314). The dissent also acknowledges that McNaughton had (or must have had) transfer books (presumably, to register transfer of the $12\frac{1}{2}\%$ senior notes), but asserts that "those books were not available for registering transfers of the notes at issue here" (dissenting op at 419). Even if correct, this pronouncement begs the question of whether, in light of section 8-401, McNaughton would have been required to register transfer of the subordinated promissory notes if the Schneiders had asked McNaughton to do so.

2000, it reported its actions to the Securities and Exchange Commission, and put out a press release to inform the public.

Finally, our determination that these subordinated promissory notes are article 8 securities is consistent with existing caselaw, sparse though it may be (*see e.g. Vigilant Ins. Co. of Am. v Housing Auth. of City of El Paso, Tex.*, 87 NY2d 36, 43 [1995] [stating broadly that "article 8 of the Uniform Commercial Code . . . governs stocks, bonds and other evidences of indebtedness"]; *see also Baker, supra* [promissory notes are securities under section 8-102]; *S.N. Phelps & Co. v Prudential Ins. Co. of Am.*, US Dist Ct, D Conn, Nov. 22, 1991, Cabranes, J. [considering senior subordinate notes, essentially indistinguishable from the subordinated promissory notes in this case, to be article 8 securities]). Treating these notes as article 8 securities comports with a central goal of the Uniform Commercial Code, which is to create a framework for commercial activity that reflects and fosters developing custom and usage. Or as one commentator remarked with specific reference to article 8: "[T]he definition [of securities] will change as 'securities' trading practices evolve to include or exclude new property interests. It is believed that the definition will cover anything which securities markets, including not only the organized exchanges but as well the 'over-the-counter' markets, are likely to regard as suitable for trading" (8 Lawrence's Anderson on the Uniform Commercial Code § 8-102:1, at 29 [3d ed rev 2005]; *see also Bentley v ASM Communications, Inc.*, 1991 WL 105220, at *2, 1991 US Dist LEXIS 7855, at *5-6 [SD NY, June 11, 1991] [citing pre-1997 Comment 2 to section 8-102 to support defining the term "security" broadly]).

Accordingly, the certified question should be answered in the affirmative.

SMITH, J. (dissenting). The question of when a promissory note is a "security" is a familiar one in federal securities law, and has proved very difficult (*see e.g. Reves v Ernst & Young*, 494 US 56 [1990]; *Chemical Bank v Arthur Andersen & Co.*, 726 F2d 930 [2d Cir 1984]; *Exchange Natl. Bank of Chicago v Touche Ross & Co.*, 544 F2d 1126 [2d Cir 1976]). The authors of the Uniform Commercial Code made the question of what is a "security" for UCC purposes easier, by including in the definition of "security" an element not present in federal securities law: with some exceptions, an obligation is not a security for UCC purposes unless it "may be registered upon books

maintained for that purpose by or on behalf of the issuer" (UCC 8-102 [a] [15] [i]). Today, the majority effectively undoes the work of the UCC's authors, by reading this registrability requirement in so broad a way as to make it meaningless.

Though it is not apparent from the majority opinion, registrability is the only significant issue in this case. No one disputes that what the majority calls the "divisibility test" and the "functional test" in the UCC definition of "security" (UCC 8-102 [a] [15] [ii], [iii]) are met here. The majority holds that the notes at issue are "represented by . . . securit[ies] certificate[s]" within the meaning of UCC 8-102 (a) (15) (i), but it does not matter whether the majority is right or wrong about this, because registrability is necessary to make either an uncertificated obligation or a non-bearer certificated obligation into a security. If the obligation is certificated, the certificate must be in either "bearer or registered form" (*id.*), and the definition of "registered form" requires that "a transfer of the security may be registered upon books maintained for that purpose by or on behalf of the issuer, or the security certificate so states" (UCC 8-102 [a] [13] [ii]). If the obligation is not certificated, it is still a security if it meets the other tests and its "transfer . . . may be registered upon books maintained for that purpose by or on behalf of the issuer" (UCC 8-102 [a] [15] [i]). Registrability is therefore critical, whether there is a certificate or not.

Before considering the meaning of the registrability requirement, it is useful to consider why the UCC's authors made it part of their definition of "security"—a definition that is completely independent of the federal securities law definition of the same term (*see* UCC 8-102, Comment 3 [1977 amendments], reprinted in 8 Lawrence's Anderson on the Uniform Commercial Code § 8-102:1, at 29-30 [3d ed rev 2005]). The apparent reason for the requirement is to facilitate line-drawing—to provide a relatively simple test to distinguish between obligations and interests that are securities and those that are not. As the Comment says: "The definition of 'registered form' . . . [s]erves primarily to distinguish Article 8 securities from instruments governed by other law, such as Article 3" (UCC 8-102, Comment 13).

These distinctions matter. For example, the rights and obligations of an issuer and holder of an article 3 negotiable instrument are substantially different from those of an issuer and holder of an article 8 security. The issuer of a security in

registered form may treat the registered owner as the owner for all purposes, until the security is presented for registration of transfer (*see* UCC 8-207 [a]). The issuer of an unregistered negotiable instrument does not have that option. The indorser of a negotiable instrument may also be liable to subsequent holders in the event that the issuer defaults (*see* UCC 3-414). The indorser of an article 8 security, in contrast, makes no warranties with respect to the issuer's ability to satisfy the underlying obligation (*see* UCC 8-108).

The need for clear distinctions led the authors of the UCC to adopt the formalistic requirement of registrability. Such formalism would be out of place in the federal securities laws, which have the prevention of fraud and other abuses in securities markets among their primary purposes. Congress wanted to make evasion of the federal securities laws difficult, and accordingly:

> "[i]n defining the scope of the market that it wished to regulate, Congress painted with a broad brush. It recognized the virtually limitless scope of human ingenuity, especially in the creation of 'countless and variable schemes devised by those who seek the use of the money of others on the promise of profits,' *SEC* v. *W. J. Howey Co.*, 328 U. S. 293, 299 (1946), and determined that the best way to achieve its goal of protecting investors was 'to define "the term 'security' in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security." ' [*United Housing Foundation, Inc. v Forman*, 421 US 837, 847-848 (1975)] (quoting H. R. Rep. No. 85, 73d Cong., 1st Sess., 11 (1933)). Congress therefore did not attempt precisely to cabin the scope of the Securities Acts. Rather, it enacted a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment" (*Reves*, 494 US at 60-61).

The UCC is less concerned with frustrating the ingenuity of schemers, and more with providing a workable and predictable code to govern legitimate transactions. The purposes of the UCC are therefore well served by making the line between securities and other interests and obligations as clear as possible—a clarity that is lacking in federal securities law. The "broad

brush" approach of the federal securities laws prompts participants in transactions to err on the side of caution, and to assume—as the parties in this case did—that anything near the borderline is a "security" for federal purposes. But the goal of the UCC is to mark the border plainly.

Registrability is a test well suited to that goal. It has long been a common practice for issuers of stocks, bonds, notes and other obligations or interests to maintain (or to retain a transfer agent to maintain) books on which the transfers of these obligations and interests may be registered. It is not hard to determine whether such books exist or not. If they do, then "transfer [of the obligation or interest] may be registered upon books maintained for that purpose by or on behalf of the issuer" and the registrability requirement is met.

In this case, no claim is made that McNaughton, the issuer of the notes in suit, maintained (itself or through an agent) transfer books on which transfers of these notes could be registered. McNaughton did have transfer books, and transfers were registered on them—including transfers of certain classes of promissory notes—but those books were not available for registering transfers of the notes at issue here. That should end the inquiry: the registrability requirement is not met, and these notes are not securities.

The majority's contrary conclusion rests in part on circular reasoning. It finds that these notes "may be" registered because UCC 8-401 would require registration—but that section applies only to "a certificated security in registered form." Whether the notes are such securities is the very question the majority is deciding.

The majority also seeks to justify its result by overemphasizing some words in the statutes describing the registrability requirement and ignoring others. It emphasizes the words "may be" (majority op at 413-414), which the majority seemingly takes to mean that the notes are registrable if any books could possibly exist in which transfers of the notes could be registered. Read so broadly, the words "may be" deprive the registrability requirement of any meaning—it is always theoretically possible there could be books on which transfers of anything could be registered. The words "may be registered upon books maintained for that purpose" are much more plausibly read to mean that "books maintained for that purpose" must exist, on which transfers may (or may not) be registered. In other words, the

requirement is met whether transfers are actually registered on the books or not, but not if there are no books "maintained for that purpose" on which registration could occur.

The majority ignores the statutory words "maintained for that purpose." It concludes that the registrability requirement is met because, if the notes are transferred and McNaughton is informed of the transfer, it must obviously record the information somewhere, so that it will have "a way to keep track of the proper payees" (majority op at 414). On this reading of the statute, it is hard to imagine any transferable obligation of any issuer that would not be registrable. The right question is not whether transfers may be reflected in some way in McNaughton's books and records—of course they may—but whether they "may be registered *upon books maintained for that purpose.*"

Confusing registrability upon transfer books with recording in corporate books generally was essentially the error criticized, in another context, by a distinguished panel of the Second Circuit Court of Appeals in *Gerard v Helvering* (120 F2d 235 [2d Cir 1941, per curiam: L. Hand, Chase and Frank, JJ.]). The issue there was whether payments on a certain bond were a "retirement" of "capital assets" for federal income tax purposes, a question that in turn depended on the registrability of the bond. The court said:

> "[the taxpayer] cannot succeed unless [the bond] was 'in registered form,' a phrase whose meaning in this context is entirely plain. It refers to the common practice in the issuance of corporate bonds which allows the holder of one or more coupon bonds of a series the option to surrender them and have one bond 'registered' upon the books of the obligor or of a transfer agent; or the holder may subscribe for such a bond in the first place. The purpose is to protect the holder by making invalid unregistered transfers, and the bond always so provides upon its face. *The mere fact that the debtor keeps books of account upon which the debt appears is altogether immaterial*; to construe the statute as the taxpayer asks would in effect make the payment of any corporate debt—'evidence of indebtedness'—a 'retirement' of 'capital assets,' for almost all corporations keep books. It is scarcely necessary to labor the answer to so plain a misinterpretation" (120 F2d at 235-236 [emphasis added]).

I find the majority's error in interpreting the UCC here to be equally plain.

Chief Judge KAYE and Judges CIPARICK, GRAFFEO and JONES concur with Judge READ; Judge SMITH dissents and votes to answer the certified question in the negative in a separate opinion in which Judge PIGOTT concurs.

Following certification of a question by the United States Court of Appeals for the Second Circuit and acceptance of the question by this Court pursuant to section 500.27 of the Rules of Practice of the Court of Appeals (22 NYCRR 500.27), and after hearing argument by counsel for the parties and consideration of the briefs and the record submitted, certified question answered in the affirmative.