740 N.W.2d 368 (2007)
16 Neb. App. 14
John C. MITCHELL, Appellee and Cross-Appellant,
v.
TEAM FINANCIAL, INC., et al., Appellants and Cross-Appellees.
No. A-05-1271.
Court of Appeals of Nebraska.
October 9, 2007.
*371 Alan E. Pedersen of McGill, Gotsdiner, Workman & Lepp, P.C., L.L.O., Omaha, for appellants.
Richard A. DeWitt and David J. Skalka of Croker, Huck, Kasher, DeWitt, Anderson & Gonderinger, L.L.C., Omaha, for appellee.
IRWIN, SIEVERS, and CASSEL, Judges.
IRWIN, Judge.

I. INTRODUCTION
Team Financial, Inc. (TFIN), Team Financial Acquisition Subsidiary, Inc. (TAC), and TeamBank, N.A. (collectively the Defendants), appeal a judgment of the district court for Douglas County granting summary judgment in favor of John C. Mitchell and denying partial summary judgment for the Defendants. On appeal, the Defendants assert the district court erred in finding that a provision under an agreement with Mitchell constituted a guaranty and in finding that the Defendants breached the terms of the agreement, releasing Mitchell as guarantor. For the reasons stated below, we affirm the trial court's order.

II. BACKGROUND
On October 29, 1999, TFIN and TAC, a bank holding company that is wholly owned by TFIN, entered into an "Acquisition Agreement and Plan of Merger" (the Agreement) with Fort Calhoun Investment Co. (FCIC), a bank holding company, and Mitchell, an FCIC stockholder who has general power of attorney to act for the remaining stockholders in FCIC. Under the terms of the Agreement, TAC and TFIN agreed to purchase 100 percent of the outstanding FCIC common stock for $3,600,000.
At the time of the merger, Fort Calhoun State Bank (the Bank) was a wholly owned subsidiary of FCIC, and the Bank held a reserve amount of $84,310 for loan loss. Prior to the closing of the Agreement, TAC conducted a review of the Bank's loans. It regarded one loan in particular, "Loan No. 635110," to be a "potential problem loan." Although 74 percent of loan No. 635110 was covered by an "SBA guarantee," the remaining 26 percent, or $175,534.13, was unsecured. As a result, the parties to the Agreement agreed that an additional reserve amount (ARA) of $170,000 would be set aside for loan loss in connection to loan No. 635110. This provision was incorporated into the Agreement under section 2.4, which read in pertinent part:
Based on a review of loans of [the Bank], TAC and FCIC have agreed that there should be established an additional reserve for loan loss [in the amount of $170,000] in connection with the uninsured portion of Loan No. 635110 with [that loan's] promissory note and related loan documents hereinafter referred to as "Loan No. 635110".
Such Additional Reserve Amount, [$170,000,] shall be deducted at Closing *372 from the Purchase Price (Cash Consideration) provided for in Section 2.2.
Section 2.4 under the Agreement further provided:
(ii) . . . [A]s long as Loan No. 635110 is not in default, [the Bank] shall distribute and pay to [Mitchell] interest on the [ARA].
. . . .
(v) If Loan No. 635110 should be in default, the [ARA] may be reduced by [the Bank] to the extent of any loss to [the Bank].
. . . .
(vii) Following default[, the] Bank or its successor shall not be obligated to pay any of the [ARA] to [Mitchell] until said loan is paid in full or written off by [the Bank].
(viii) [Mitchell] shall have the option to have the portion of [the loan's promissory] note not guaranteed by [the SBA guaranty] and the security thereon assigned to [Mitchell].
(ix) Upon payment in full of said loan or upon said note being written off, any remaining balance of the [ARA] shall be paid to [Mitchell].
(x) . . . [I]f the borrower . . . should make 24 consecutive timely monthly payments (not more than 30 days past due) of the regular principal and interest payments due on . . . Loan No. 635110 and if the borrower is not otherwise in default pursuant to the terms of the loan documents, then any remaining balance in the [ARA] shall be paid forthwith to [Mitchell] free and clear of any obligation for payment of Loan No. 635110. . . .
(xi) [The Bank] shall make quarterly reports to [Mitchell] from such time [as] Loan No. 635110 is in default until the [ARA] is exhausted.
The evidence indicates that prior to the closing of the Agreement, the Bank conducted a board of directors' meeting on February 29, 2000. Mitchell, who served as chairman of the board of directors, was present. At the meeting, a list of substandard loans was circulated, and a loan report indicated that the principal debtor for loan No. 635110 had not made his February payment, which had been due on February 13.
The parties closed the Agreement on March 24, 2000. Although the evidence does not indicate the exact date, at some point after the closing of the Agreement, the Bank merged into TeamBank, N.A., a wholly owned subsidiary of TFIN and TAC. Because the terms of the Agreement include successors to the Bank, we will continue to refer to the newly merged bank as "the Bank."
On March 7, 2001, the Bank sent notice to the principal debtor for loan No. 635110, informing him that he was in default on the loan and that the full sum was due on or before April 7.
On December 3, 2002, more than 24 months after the closing of the Agreement, Mitchell tendered a formal demand of payment to the Defendants for the ARA of $170,000. TFIN's attorney responded by letter, stating, "My general understanding is that [loan No. 635110] went into default some time following the Effective Time of the merger and thereafter the collection efforts have been continuing." TFIN later sent a followup letter stating that when the Agreement became effective on March 24, 2000, loan No. 635110 was already in default. An additional followup letter further indicated that because there was a principal balance of $175,534.13 due on the unsecured portion of the loan, the Defendants intended to withhold the ARA to satisfy the loss.
*373 On February 25, 2004, Mitchell filed a complaint alleging two causes of action: breach of contract and declaratory judgment seeking discharge of guarantors. In the first cause of action, Mitchell alleged that the Defendants breached section 2.4 of the Agreement because the Bank failed to make either interest payments from the ARA or quarterly reports indicating that loan No. 635110 was in default. Mitchell asserted that his rights under the Agreement were greatly impaired because he was unable to reduce or mitigate his exposure to loss as the guarantor of loan No. 635110. Under the second cause of action, Mitchell alleged that he should be discharged and excused from payment of any amount of the guaranty due to acts or omissions by the Defendants. We note here that Mitchell filed the complaint in his personal capacity. He asserted by affidavit that he is entitled to the full $170,000 because he distributed the cash consideration in the Agreement to the other FCIC shareholders, but did not reduce their payments by the $170,000 ARA. This position is not disputed by the Defendants.
Mitchell filed a motion for summary judgment on March 23, 2005. On May 6, the Defendants filed a motion for partial summary judgment, asserting that Mitchell's second cause of action seeking a declaratory judgment and discharge of guarantors should be dismissed. Following an evidentiary hearing, the trial court granted Mitchell's motion for summary judgment and dismissed the Defendants' motion on September 19.
The trial court looked to whether the $170,000 ARA under section 2.4 constituted an earn-out provision, an indemnity clause, or a guaranty. The court found that section 2.4 "d[id] not appear to be an earn-out provision" because "[n]othing in Section 2.4 addresses the overall earnings or value of [the Bank]; rather, Section 2.4 is entirely concerned with the specific performance of Loan No. 635110" (emphasis in original). The court further found that section 2.4 did not constitute an indemnity clause because "[n]othing in the provisions of Section 2.4 serves to protect TFIN or TAC from a liability they owe or may owe to a third party." The trial court found that section 2.4 operated as a guaranty. The court noted that the $170,000 ARA, supplied by Mitchell, would be reduced by the Bank only upon the principal debtor's failure to pay. The court further noted that upon satisfaction of the debt, any remaining balance in the ARA would be paid to Mitchell "free and clear of any obligation for payment of Loan No. 635110" (emphasis in original). The court found that the Defendants breached the Agreement by failing to make quarterly reports to Mitchell and concluded that Mitchell should be released as guarantor.

III. ASSIGNMENTS OF ERROR
The Defendants assign two errors on appeal. First, they assert that the district court erred in finding that section 2.4 under the Agreement constitutes a guaranty by Mitchell to the Bank for loan No. 635110. Second, they assert that the district court erred in finding that Mitchell should be released from his obligations as guarantor.
On cross-appeal, Mitchell assigns one error. He asserts that in the event this court finds in favor of the Defendants, the district court erred in admitting certain parol evidence. Because we find that summary judgment in favor of Mitchell was proper, this cross-appeal is moot and we need not address it further.

IV. ANALYSIS

1. STANDARD OF REVIEW
Summary judgment is proper when the pleadings and evidence admitted at the *374 hearing disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. NEBCO, Inc. v. Adams, 270 Neb. 484, 704 N.W.2d 777 (2005); Fraternal Order of Police v. County of Douglas, 270 Neb. 118, 699 N.W.2d 820 (2005).
In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. NEBCO, Inc. v. Adams, supra; Plowman v. Pratt, 268 Neb. 466, 684 N.W.2d 28 (2004).

2. SECTION 2.4 UNDER AGREEMENT
The Defendants challenge the trial court's finding that section 2.4 under the Agreement constitutes a guaranty. They argue that section 2.4 is not a guaranty because it operates as either an earn-out provision or an indemnity clause. We disagree.

(a) Section 2.4 as Guaranty
A guaranty is a collateral undertaking by one person to answer for the payment of a debt or the performance of some contract or duty in case of the default of another person who is liable for such payment or performance in the first instance. Northern Bank v. Dowd, 252 Neb. 352, 562 N.W.2d 378 (1997); Chiles, Heider & Co. v. Pawnee Meadows, 217 Neb. 315, 350 N.W.2d 1 (1984). As such, a guaranty is basically a contract by which the guarantor promises to make payment if the principal debtor defaults. Northern Bank v. Dowd, supra. We rely on general principles of contract and guaranty law to determine the obligations of the guarantor. Rodehorst v. Gartner, 266 Neb. 842, 669 N.W.2d 679 (2003). Because a guaranty is a contract, it must be understood in light of the parties' intentions and the circumstances under which the guaranty was given. NEBCO, Inc. v. Adams, supra.
In the instant case, section 2.4 functions as a guaranty by Mitchell for the unsecured portion of loan No. 635110 because Mitchell, as guarantor, provided the $170,000 to the Bank and promised to answer for up to $170,000 of the principal debtor's default. The terms under section 2.4 of the Agreement state that the $170,000 ARA may be used by the Bank only in connection with the uninsured portion of loan No. 635110. Under those terms, if the debtor fails to make proper payments to the Bank and loan No. 635110 goes into default, the ARA may be reduced by the Bank only to the extent that the Bank experienced any loss. Moreover, the evidence further indicates that section 2.4 is a guaranty because the remaining balance of the ARA is to be returned to Mitchell free and clear of any obligation upon 24 timely consecutive payments on loan No. 635110 or upon the loan's full payment.
The Defendants argue on appeal that Mitchell cannot be a guarantor because "the identity of the debtor is not even established in the . . . Agreement." Brief for appellants at 22. This assertion is untrue. The Agreement expressly provides that the ARA in the amount of $170,000 is to be used only with "the uninsured portion of Loan No. 635110 with [the loan's] promissory note and related loan documents." The loan documents for loan No. 635110 expressly provide the name of the principal debtor. The Defendants also argued to the trial court that section 2.4 cannot operate as a guaranty because Mitchell promises to protect the Bank against loss or damage, not TAC and FCIC, the parties to the Agreement. As *375 noted by the trial court, "TFIN and TAC concede that Section 2.4 is beneficial to them in that it protects the value of [the Bank], a wholly-owned subsidiary of TFIN and TAC." Therefore, although Mitchell's promise to guarantee loan No. 635110 benefits the Bank, it also inures to the benefit of TFIN and TAC. As such, after viewing the evidence in the light most favorable to the Defendants, we find no error in the trial court's finding that there is no genuine issue of material fact regarding section 2.4 as a guaranty.

(b) Section 2.4 as Earn-Out Provision
The Defendants argue that section 2.4 operates as an earn-out provision, or price adjustment term, instead of a guaranty because the purchase price would be reduced by the $170,000 ARA upon the principal debtor's default. We find no merit to this argument.
Nebraska statutory and case law does not define "earn-out" provision. However, as defined by the Practicing Law Institute: "An earnout provision makes a portion of the payment to the sellers contingent upon the target reaching specified milestones during a specified period after the closing. The milestones used are usually financial, such as net revenues, gross profits, EBIT, EBITDA, net income or earnings per share." Maryann A. Waryjas, Structuring and Negotiating Earn-Outs, Acquiring or Selling the Privately Held Company 2007, at 759, 761 (PLI Corporate Law & Practice, Course Handbook Series 2007). Earn-out provisions in merger-and-acquisition agreements have further been described as provisions that are "intended to accommodate the seller's desire for compensation for the anticipated future value of the transferred assets and the buyer's reciprocal desire to avoid overpaying for potential, but as yet unrealized, value." Highland Capital Mgt. LP v. Schneider, 8 N.Y.3d 406, 408 n. 1, 834 N.Y.S.2d 692, 693-94 n. 1, 866 N.E.2d 1020, 1021-22 n. 1 (2007). As explained in Robert M. Fogler & Rob Witwer, Buying, Selling, and Combining Businesses Under the Colorado Business Corporation Act, 33 Colo. Law. 73, 78 (Nov. 2004), in an earnout provision, "a portion of the purchase price depends on the success of the business during the year or two following the sale," and that is usually "tied to projected revenue or profit numbers." Furthermore, earn-out provisions alleviate the effects of information disparity by punishing a seller's withholding of information; they encourage seller shareholders to assist with transitional issues, and they discourage seller shareholders from inflating financial performance numbers. Id.
Viewing the evidence in the light most favorable to the Defendants and giving them the benefit of all reasonable inferences, the evidence fails to prove that section 2.4 is an earn-out provision. The $170,000 ARA was not set aside by the Defendants for Mitchell as contingent payment upon the completion of specified milestones by the acquired business. Rather, the $170,000 ARA was set aside by Mitchell as security to the Defendants for the unsecured portion of loan No. 635110. Unlike an earn-out provision, which typically concerns the success of the entire business in the year or two following the sale, section 2.4 provides that the ARA in the instant case is to be utilized only when the principal debtor fails to make payments on the unsecured portion of loan No. 635110. The application of the ARA funds is in no way related to the overall performance of the acquired business.

(c) Section 2.4 as Indemnity Provision
The Defendants next argue that to the extent we determine that section 2.4 constitutes something more than an earnout provision, it is an indemnity clause. *376 They argue that section 2.4 is an indemnity provision because it protects TAC and TFIN should they incur potential obligation or suffer any loss due to the substandard loan. We also find no merit to this argument.
Under Nebraska case law, if a contract of indemnity refers to and is founded on another contract, either existing or anticipated, it covenants to protect the promisee from some accrued or anticipated liability arising on the other contract. See Currency Services, Inc. v. Passer, 178 Neb. 286, 133 N.W.2d 19 (1965). Stated another way, the promise of the indemnitor is not to answer for the debt, default, or miscarriage of another, but may be to make good the loss resulting from such debt, default, or miscarriage. See, 28 C.J. Guaranty § 8 at 892 (1922); Assets Realization Co. v. Roth, 226 N.Y. 370, 123 N.E. 743 (1919); Eckhart v. Heier, et al., 37 S.D. 382, 158 N.W. 403 (1916). The distinction between a guaranty provision and an indemnity provision is explained as follows:
[T]he promisor in an indemnity contract undertakes to protect his promise against loss or damage through a liability on the part of the latter to a third person, while the undertaking of a guarantor or surety is to protect the promisee against loss or damage through the failure of a third person to carry out his obligations to the promisee.
38 Am.Jur.2d Guaranty § 14 at 882 (1999).
In the instant case, section 2.4 does not operate as an indemnity provision. Mitchell did not undertake to protect TAC against loss or damage caused by liability on the part of TAC to a third person. On the contrary, Mitchell undertook to protect the Bank, a wholly owned subsidiary of TAC, against loss or damage caused by liability on the part of a third party to TAC. Whereas the promise of an indemnitor is to "make good any loss resulting from non-payment," Mitchell's promise is to answer for the debt, default, and miscarriage of another. See Eckhart v. Heier, et al., 37 S.D. at 384, 158 N.W. at 403. As such, we find no error by the trial court in concluding that section 2.4 was not an indemnity provision.

3. RELEASE OF GUARANTOR
The Defendants assert that in the event this court finds section 2.4 to be a guaranty, the trial court erred in releasing Mitchell as a guarantor. The Defendants argue that a genuine issue of material fact exists regarding whether the Bank breached its contractual obligation to Mitchell under the Agreement. We disagree.
A court interpreting a contract must first determine as a matter of law whether the contract is ambiguous. Kluver v. Deaver, 271 Neb. 595, 714 N.W.2d 1 (2006). A contract written in clear and unambiguous language is not subject to interpretation or construction and must be enforced according to its terms. Id. A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings. Id. A contract must receive a reasonable construction and must be construed as a whole, and if possible, effect must be given to every part of the contract. Id.
The trial court concluded the plain meaning of section 2.4(x) to be that loan No. 635110 is in default when the payments are more than 30 days past due. It based this finding on section 2.4(x), which provides that any remaining balance of the ARA should be paid to Mitchell "if the borrower . . . should make 24 consecutive timely monthly payments (not more than 30 days past due)" (emphasis supplied). Under the trial court's holding, a payment *377 is considered timely unless it is over 30 days past due. At that point, it is no longer timely and the loan is considered to be in default. Construing the Agreement as a whole, we find no error in the trial court's finding that the term "default" means "more than 30 days past due."
Mitchell asserts that the Bank breached its obligations under the Agreement because the principal debtor defaulted on the loan and the Bank failed to notify Mitchell of the principal debtor's default. As a result, he claims the trial court correctly held that he should be released as guarantor. To determine whether the trial court correctly determined that Mitchell is not liable for the principal debtor's failure to pay on loan No. 635110, we must determine the obligations of the parties.
The Nebraska Supreme Court has held that a guarantor is not liable on his own contract when the creditor has violated his own obligations and deprived the guarantor of the means of preventing the loss protected by the guaranty. National Bank of Commerce Trust & Say. Assn. v. Katleman, 201 Neb. 165, 266 N.W.2d 736 (1978).
In the instant case, neither party disputes the fact that the principal debtor defaulted on the loan. TFIN and TAC initially stated in a letter that the principal debtor defaulted on the loan after the closing of the Agreement, but later retracted this assertion in a letter claiming the principal debtor defaulted on the loan prior to the March 2000 closing of the Agreement. The evidence shows that the Defendants formally notified the principal debtor by letter in March 2001 that loan No. 635110 was in default. As such, the evidence is undisputed that loan No. 635110 was in default.
Next, we look to the parties' obligations under the Agreement. Section 2.4(ii) provides, "[A]s long as Loan No. 635110 is not in default, [the Bank] shall distribute and pay to [Mitchell] interest on the [ARA]." Section 2.4(xi) further provides, "[The Bank] shall make quarterly reports to [Mitchell] from such time [as] Loan No. 635110 is in default until the [ARA] is exhausted." As such, from the date of the Agreement's closing in March 2000, the Bank was under an obligation to send Mitchell, at an interval of four times a year, either payments from the ARA interest or reports indicating the loan's default status. The evidence indicates that the Bank did not meet either obligation at any time because Mitchell never received interest payments or quarterly reports. As such, because the Defendants violated their own obligations under the Agreement, Mitchell, as guarantor, is not liable. See National Bank of Commerce Trust & Say. Assn. v. Katleman, supra.
The Defendants argue that "factual issues exist" regarding whether Mitchell had notice of the default. Brief for appellants at 30. They appear to imply that if Mitchell had notice of a default at the time of the closing, such notice would alleviate their responsibility to make quarterly reports. We note that the Defendants fail to specify in their brief which factual issues indicate that Mitchell had notice of the default prior to the closing of the Agreement. To the extent that the Defendants are referring to Mitchell's knowledge, as of the February 29, 2000, board meeting, that loan No. 635110 was past due, we find such knowledge insufficient to constitute notice of default. On February 29, loan No. 635110 was only 16 days past due, and according to the language of the Agreement, it was not yet in default. To the extent that the Defendants are referring to an alleged telephone discussion between the Bank's president and Mitchell, whereby the president alleges Mitchell was told that the loan was "delinquent," we also *378 find such evidence insufficient to constitute notice of default. The term "delinquent" does not necessarily indicate that the loan was more than 30 days past due. Moreover, we further note that the Defendants had a continuing obligation to inform Mitchell of the loan's status in that the Agreement required they make quarterly reports.
Accordingly, we find no error in the trial court's finding that there is no genuine issue of material fact in dispute regarding the breach of the Agreement by the Defendants. The principal debtor defaulted on the loan, section 2.4 required that the Defendants make quarterly reports to Mitchell regarding a default on the loan, and no reports were made. As such, we find no error in upholding the release of Mitchell as guarantor.

V. CONCLUSION
We conclude that the trial court did not err in granting summary judgment in favor of Mitchell and in denying partial summary judgment to the Defendants. There is no genuine issue of material fact in dispute regarding the nature of section 2.4 as a guaranty provision. We further conclude that there is no genuine issue of material fact in dispute regarding the Defendants' breach of the Agreement. As such, we affirm.
AFFIRMED.