# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-11026

United States Court of Appeals
Fifth Circuit

**FILED**

July 3, 2014

Lyle W. Cayce
Clerk

HIGHLAND CAPITAL MANAGEMENT, L.P.,

　　　　　　　　　　　　　Plaintiff–Appellant,

versus

BANK OF AMERICA, N.A.,

　　　　　　　　　　　　　Defendant–Appellee.

Appeal from the United States District Court
for the Northern District of Texas
No. 3:10-CV-1632

Before SMITH, WIENER, and PRADO, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]

Highland Capital Management, L.P. ("Highland"), and Bank of America entered negotiations for the bank to sell to Highland a $15.5 million loan (the

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 13-11026

"Regency Loan") at 93.5% of par value.  On December 3, 2009, Highland's representative, Daugherty, and the bank's representative, Maidman, had a telephone call in which they agreed to that price.  Maidman, however, stated during that call and in a subsequent email that the trade was "subject to appropriate consents and documentation."

Highland sued to enforce the putative contract.  This dispute centers on whether an oral contract was formed under New York law when the price of the trade was agreed to, or whether Maidman's caveat evinced the bank's intent not to be bound by Maidman's caveat.  The district court granted summary judgment for Bank of America, holding that there was no genuine dispute of material fact.  We agree and affirm.

I.

A.

The district court ruled that New York substantive law applies because Bank of America and Highland had entered into trades in the past that included terms stating that New York law would govern all future trades, and because the bank's own draft contract documents in the present trade suggest that it intended New York law to apply.  We apply New York law because neither side disagrees.

B.

The law on contract formation is not in question.  As a panel of this court explained at the Rule 12(b)(6) stage of this case, each party must manifest an intent to be bound.[1]  When there is an alleged oral contract, the court considers

---

[1] *Highland Capital Mgmt., L.P. v. Bank of Am., Nat'l Ass'n*, 689 F.3d 202, 206–07 (5th

No. 13-11026

extrinsic evidence and looks for four factors: (1) whether there has been an express reservation to be bound only in writing, (2) whether there has been partial performance, (3) whether all terms have been agreed to, and (4) whether the agreement is of the kind usually committed to writing.[2]

The question is therefore whether Highland has pointed to evidence to create a genuine dispute as to whether Bank of America intended to be bound. Highland insists that, notwithstanding the apparent reservation and that there was no partial performance, it has presented evidence that all terms have been agreed to and that the agreement is *not* the kind usually committed to writing. Highland's theory is somewhat confusing but seems to rely entirely on industry custom. It maintains that when the dealings are interpreted in light of industry custom, as evinced by the standard terms for such trades promulgated by the Loan Syndications and Trading Association ("LSTA"), a genuine dispute exists as to whether the bank's agreement to the price demonstrates an intent to be bound. But Highland also seems to contend separately that Bank of America previously conducted a trade with it in which the LSTA terms governed, and one of those terms stated that any *future* trade between the two will be binding once they agree on the price.

Highland's first theory is problematic. The LSTA standard terms are not *binding law*, and so long as Bank of America expressed an intent not to be governed by the LSTA, anything that the LSTA has to say about contract formation is of no import. It could be that the LSTA reflects "industry custom" and that such custom suggests that the bank intended to bind itself once it agreed to all the terms discussed in the phone call. But the bank demonstrated

Cir. 2012) (citing *Powell v. Omnicom*, 497 F.3d 124, 129 (2d Cir. 2007)).

[2] *See id.* at 208; *Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 80 (2d Cir. 1985).

3

that it did *not* want to follow the LSTA, the LSTA standard terms tell us nothing about the bank's intent.

The evidence that the bank intended *not* to be bound is overwhelming, and the only evidence that Highland puts forward is question-begging. Maidman explained in the phone call that the deal would be "subject to appropriate consents and documentation." Daugherty admits that Maidman said, "We have our own docs." Shortly after the conversation, Maidman sent Daugherty an email and reiterated that the trade "is subject to appropriate consents and documentation." Later that same day, the bank's outside counsel, David Eades, emailed another Highland employee, Carter Chism, and stated,

> We've been retained by BoA in connection with this *proposed* loan trade. Can you give me a call at your convenience to discuss matters? Note that BoA does not plan to use Banc [*sic*] of America Securities trading desk for this matter, *so its protocol may differ from similar trades you have done with the bank.*

The next day, another Bank of America employee, Caroline Yingling, emailed Chism to explain that the LSTA Standard Terms do "not contain the necessary confidentiality provisions." On December 9, she again emailed Chism with draft documents and explained that they "remain subject to further review and final approval." She also warned that, before the bank would attempt to get the borrower's consent to the loan assignment, it would first need to "work[] out any comments" Highland had about the draft documents. When Chism responded on December 11 with the LSTA trade-confirmation forms, Yingling reiterated that the prior draft documents would have to be agreed to *in addition to* the LSTA trade confirmations. She also repeated that the bank would have to agree to the draft documents before attempting to obtain the borrower's consent to the assignment.

The district court also relied on Daugherty's deposition testimony that,

although he had said the deal was "done"—the customary way to finalize a trade deal—he admitted that he could not get anyone at the bank to say that it was "done." Specifically, Daugherty testified, "I could never get [Maidman] to say we were done. I remember that, being very frustrated. He would never say he was done. And it was, you know, cause for concern because obviously I wanted to do this trade, and I could never get him to say we were done." Daugherty also testified that he "didn't think it was a guaranteed deal."

Further, Daugherty testified that he recognized Maidman was not a trader and that, although his "trading etiquette" was "terrible" and "very annoying," Daugherty "had to tolerate it because [he] knew [he] wasn't going through the standard process, or whatever, of trading with a trading desk." Highland acknowledges that Maidman had no experience trading loans and admits that Maidman said nothing about the LSTA in the December 3 call.

There was no agreement as to any particular confirmations, and on December 18 Chism circulated revised confirmations. Yingling responded by adding two terms: that the trade is still subject to consent of the borrower, and the bank is not liable if it is unable to obtain such consent. Highland rejected the indemnification provision, and negotiations deteriorated. Eventually the loan would pay off at par value.

Highland has put forward no facts to create a genuine dispute as to whether industry custom might change the meaning of Bank of America's dealings. Although industry custom is extrinsic evidence a factfinder can use to determine the parties' intent to be bound, its value is substantially diminished where, as here, other evidence overwhelmingly shows that the persons involved in the dealings were unaware of those customs. Industry custom is not binding law but only helps the trier of fact to understand the meaning of the words used. Highland admits that Maidman and Yingling were unfamiliar

with the LSTA and were "novices" in this area. Highland tries to avoid this bind by claiming on appeal that Bank of America was an experienced LSTA trader, but that is irrelevant. Whether the bank intended to be bound in this instance depends on the knowledge, understanding, and words of its representatives.

Highland offers no evidence to suggest that Bank of America even thought the LSTA terms would apply. Indeed, when the LSTA was finally mentioned after Highland sent over an LSTA confirmation, the bank explicitly said it did not want to use that confirmation because it did not contain the necessary confidentiality provisions. The bank's documents never mentioned the LSTA. Highland wants us to interpret this to mean that the bank never proposed to use something *other than* the LSTA. But Highland is assuming, without proof, that somehow the LSTA is a background principle of law that is binding on the parties unless they opt out. That assumption is unfounded.

Highland relies heavily on the SAG Credit Approval Document, noting that it did not include the later controversial indemnification terms. Highland asks this court to believe that, therefore, the bank intended to be bound by the LSTA terms only until much later, when it allegedly found out that the loan would pay at par and therefore wanted the indemnification provision. But that again assumes that the default rules are the LSTA terms, even though weighty evidence has been adduced that the bank did not want the LSTA to govern, and no evidence has been presented indicating that the bank expected to be bound by the LSTA. More generally, the fact that the bank did not include the *future* terms that it would eventually seek tells us nothing about whether the bank had already agreed to be bound by the *current* proposed terms. Indeed, Maidman explicitly told Highland that he would need approval for the terms in the SAG Credit document, as Highland admits.

No. 13-11026

Highland's remaining evidence is beside the point. Even if the district court erroneously found that Bank of America had checked the "assignment only" box on the LSTA confirmation and did not know that the loan would pay full value until much later, none of that speaks to whether the LSTA procedures for the creation of an enforceable contract were ever binding on the bank in the first place. Regarding the December 11 confirmation that supposedly incorporated the LSTA, Highland never countersigned, so there was still no agreement at that point. Lastly, the evidence that "commercial loan trades are typically not committed to writing" cannot counteract objective indications that the bank wanted *this trade* to be in writing. Industry custom, again, is not binding law but merely a tool by which courts interpret contract language.

The decision in *APS Capital Corp. v. Mesa Air Group, Inc.*, 580 F.3d 265 (5th Cir. 2009), on which Highland heavily relies, has nothing to do with the issues here. There the court found a contract ambiguous because it had language suggesting a completed transaction—both said "done" after deciding on the price—but the email said it was a "preliminary" agreement and that a "fuller" agreement would have to be negotiated. Moreover, there was only passing mention of the LSTA. Here, in contrast, Highland's whole argument is based on whether the LSTA applies, and Highland has not adduced any evidence or cited any law regarding the binding effect of prior LSTA agreements or otherwise suggesting that the bank's representatives were acting within the same customary industry framework in which Highland was operating.

For its second theory, Highland claims that no later than October 2003—six years before the current trade—it and the bank executed an LSTA confirmation that incorporated the "Binding Effect Standard Term" of "Paragraph 21" of the standard LSTA terms. "Because Highland and Bank of America . . . had executed LSTA confirmations on multiple prior trades,"

7

No. 13-11026

Highland argues, "by default the parties had already agreed to the LSTA's Binding Effect Provision and Form of Purchase Standard Term *before* they began negotiating the Regency Loan trade." Accordingly, Highland writes, the bank had to opt out of the LSTA unambiguously, and "contractual obligations existed between Bank of America and Highland before they ever began negotiating the Regency Loan trade."

This proposition is a matter of contract *interpretation*, which is not a question for the trier of fact.[3] Whether a prior contract had a binding effect on the procedures available for future contract-formation is a legal question. And Highland has put forward no caselaw to establish that a prior LSTA trade binds the corporate entity to its contract-formation procedures. Indeed, Highland cites no caselaw on the meaning of Paragraph 21, so at best it has waived this part of its argument on appeal.[4]

II.

Highland contends that the district court erred in excluding its expert report by Allison Taylor, a co-founder and past executive director of the LSTA. We agree with the district court's observation that the report is excludable because it makes several legal conclusions reserved for the court, improperly credits or discredits witness testimony, and otherwise makes factual determinations reserved for the trier of fact. Either way, the report offers no evidence whatsoever that the LSTA's terms were binding on Bank of America. It offers no relevant evidence about industry custom not already discussed above.

Finally, as for Highland's alternative claim that even if no contract had

---

[3] *X Techs., Inc. v. Marvin Test Sys., Inc.*, 719 F.3d 406, 413 (5th Cir. 2013).

[4] *See L&A Contracting Co. v. S. Concrete Servs., Inc.*, 17 F.3d 106, 113 & n.27 (5th Cir. 1994).

No. 13-11026

been formed, the bank had an obligation to negotiate a final contract in good faith, Highland agrees with the district court's legal conclusion that the test to determine whether a preliminary agreement existed is "substantially identical" to the question whether an oral contract was formed.  Therefore, relying on the same evidence previously adduced, we conclude that no preliminary agreement existed.

The judgment is AFFIRMED.