**REVERSE and RENDER; and Opinion Filed December 4, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-13-00948-CV

### RBC CAPITAL MARKETS, LLC, Appellant
### V.
### HIGHLAND CAPITAL MANAGEMENT, L.P., Appellee

**On Appeal from the 95th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-11-02034-D**

## MEMORANDUM OPINION

Before Justices Evans, Brown, and Schenck[1]
Opinion by Justice Brown

This dispute concerns an alleged 2001 oral contract in which RBC Capital Markets, LLC agreed to sell Highland Capital Management, LP seven promissory notes ("Notes") having an aggregate face value of $45.4 million for 52 ½ cents on the dollar. Highland sued RBC for breach of contract asserting it reneged on its promise to sell Highland the Notes. Highland asserted it suffered $21.5 million in benefit of the bargain damages because the value of the Notes was their full face value.

The Notes were securities under New York law, which is also the law the parties agree we must apply in determining whether a contract existed. To show the contract existed,

---

[1] The Honorable Justice David J. Schenck succeeded Justice Michael O'Neill, a member of the original panel, following Justice O'Neill's retirement. Justice Schenck has reviewed the briefs and record before the Court.

Highland relied on evidence that the parties agreed to the price in which they would exchange the Notes, thereby agreeing to "price and principal,"[2] which constitutes a securities trade, obligating RBC to deliver the Notes to Highland.

At the time of the agreement, RBC did not own the Notes, but was acting as an intermediary negotiating Highland's acquisition from the owners. If successful, RBC would purchase the Notes from the owners and sell them to Highland. However, after Highland and RBC reached an agreement on price and principal, the owners of the Notes refused to sell them. Consequently, the trade never closed or settled. Shortly thereafter, the owners were paid the full face value of the Notes. Highland subsequently sued RBC seeking to recover the difference between the agreed upon sales price and the full face value of the Notes. Following a jury trial, the trial court rendered judgment in favor of Highland, awarding it over $21.5 million in actual damages plus prejudgment interest. On appeal, RBC asserts Highland failed to show a contract existed because Highland's agreement to purchase the Notes was subject to other terms and conditions that had not occurred and remained to be negotiated.[3] RBC also asserts no contract was formed because the parties did not intend to be bound to an oral agreement. For the following reasons, we reverse the trial court's judgment and render judgment that Highland take nothing.

## Background

In 2000, the McNaughton Apparel Group, Inc. delivered eight subordinate promissory notes with an aggregate face value of $69 million to Leonard Schneider and his three children for monies owed in connection with its acquisition of the Schneiders' apparel business. The Notes

---

[2] The agreement as to "price and principal" was also referred to as an agreement as to "price and size," size meaning $45.4 million, the aggregate face value of the seven notes. Because the agreement was made in reference to seven discrete notes, we will use the phrase "price and principal," understanding that by agreeing to principal, the parties agreed to size.

[3] RBC raises four other issues, which we need not reach, complaining Highland presented no evidence of damages, Highland's suit is barred by limitations, the trial court's erroneous evidentiary rulings misled the jury, and the suit should have been abated.

were subordinate to McNaughton's senior debt, which was substantial. In January 2001, the Schneiders retained Glen Rauch Securities to market the Notes, which were considered high-yield debt securities. Unable to locate a buyer on its own, Rauch enlisted the assistance of RBC, a securities broker-dealer that trades such securities over the counter on the secondary market.

RBC agreed to market the Notes, intending to act as a riskless principal. Specifically, if RBC found a willing buyer, it would purchase the Notes from the Schneiders and immediately thereafter resell them to the buyer for a slightly higher price, earning the spread between the two prices.

One of RBC's clients, Highland, was already familiar with McNaughton, and expressed interest in the Notes. Beginning in January 2001, Highland discussed pricing and other conditions it would require if it purchased the Notes. Recordings of these discussions were presented in evidence. These recordings show that Highland notified RBC from the outset that any of its bids would be subject to various conditions due to the nature of the securities at issue, which were unique seller notes. Specifically, Highland informed RBC it would only bid on the Notes if it received representations from the Schneiders, and a specific written representation from McNaughton that there were no side letters concerning the Notes.

Because Highland would only purchase the Notes on certain conditions, it told RBC it could give a "subject to" bid, but suggested RBC first run it by the Schneider family to see if they would be willing to move forward on that basis. RBC responded it had already done so and that Highland's conditions were worthy of discussion and further pursuance.

According to Highland, on March 12, it made a firm oral bid to purchase the Notes, which RBC orally accepted on March 14. By the time of trial, twelve years later, the individuals who made these communications had little independent memory of them. However, recorded calls show the parties' negotiations between these dates.

–3–

To show it made a firm bid to purchase the Notes, Highland relies on a March 12 call. On that call, Highland did not state it was making a firm bid or mention how many of the Notes it was bidding on. Instead, that call was devoted almost entirely to Highland communicating the conditions of its bid. Specifically, Highland began the conversation stating if they were to be finished at the 52 1/2 level, it would be subject to docs and reps, meaning that the trade would be documented and Highland would require representations and warranties about the Notes. Highland told RBC it did not know how many representations it would be, but they would include one from McNaughton.

Evidence at trial showed that the documentation the parties were referencing included a written trade confirmation. Highland also told RBC on that call it wanted language in the documents providing the trade would settle within ten days of reaching an agreement and for some sort of penalty if either side was dragging their feet. After RBC indicated it would take ninety plus days to settle, Highland explained it needed to settle quickly because it had reporting deadlines to meet.

On another call later that day, Highland told RBC it was already working with its lawyer on the documentation. Highland asked RBC, assuming they agreed on price and the various outs Highland had already mentioned, what RBC's thoughts were on the appropriate way to document the transaction. They both agreed the documentation would not be standard and Highland would need to craft something to reflect all of its various concerns.

When the Schneiders had not yet responded to Highland's offer by the following day, Highland told RBC that if the punitive language became a stumbling block to getting some answer that day, Highland would be willing to listen to the Schneiders' or RBC's suggestions as to some sort of general settlement.

–4–

On the afternoon of March 14, RBC called Highland and they again discussed the deal. At the time of that call, both Highland and RBC acknowledged they were all in agreement on price. Nevertheless, RBC told Highland the Schneiders still wanted to talk to their lawyer before committing. RBC also told Highland that it believed that "subject to just about everything . . . they could imagine," they would have a trade.

Highland remained frustrated because it had timing demands. It cautioned RBC that if the Schneiders kept delaying, its bid would fade. Highland explained to RBC the trade absolutely had to settle by the end of the month. RBC voiced concerns that Highland's timing demands might cause the Schneiders to "forget the whole thing." Highland said it might be able to give an additional day or two at most because Highland had an indenture issue it had to solve.

According to Highland, later that afternoon, RBC accepted its offer, entering into a legally binding trade. However, none of Highland's witnesses could recollect receiving RBC's acceptance. Therefore, to show RBC accepted its offer, Highland relied on testimony at a prior trial against the Schneiders ("Schneider trial") about the Notes.

At the Schneider trial, Wood, the RBC salesman who had negotiated the trade with Highland, testified that on March 14, RBC executives told him to call Highland and "confirm the trade." According to Highland, this was immediately after RBC agreed to purchase the Notes from the Schneiders. In any event, Wood testified at the Schneider trial that he called Highland and said, "We're done on the trade. We have an agreement on price and principal and subject to docs."[4]

To further show the parties entered into a contract on March 14, Highland presented evidence of its own trade ticket, which was an internal e-mail formally documenting that a trade

---

[4] This testimony was elicited by Highland to support its theory that it was a third-party beneficiary of the alleged contract between RBC and the Schneiders.

had occurred.  The e-mail was sent by Michael Rich, one of Highland's portfolio managers, who was also involved in the negotiations.  The e-mail stated that Highland had bought the Notes from RBC "subject to extensive documentation" with a goal to settle within ten days after the trade date.  The e-mail also stated that Highland was "crafting a customized trade confirm and note purchase agreement with attorney . . . ."  At trial, Rich testified that he would not have generated the trade ticket if there had not been a trade.  Nevertheless, he could not recall the communication that precipitated him to generate the ticket.

That afternoon, almost immediately after the alleged oral contract was formed, Highland sent RBC an e-mail with an attached draft of a Note Trade Confirmation, and asked for RBC's comments.  The draft stated it was confirming a trade "subject to the terms and conditions" contained therein.  The draft included the pricing that had been agreed to, but also included provisions related to Highland's other conditions, that remained to be negotiated.  For example, it required settlement no later than ten business days from the trade date.  It also included several conditions precedent, all of which had to occur before the settlement date.  If any condition precedent did not occur before that time, *either* Highland or RBC could terminate the confirmation rendering it null and void.  The draft contained signature blocks for both Highland and RBC to sign.

After RBC received the draft confirmation, it attempted to discuss its proposed terms with the Schneiders through their agent, Rauch.  Rauch could provide no feedback because the Schneiders were not returning its calls.  On March 20, RBC and Highland were told that the Schneiders had decided not to sell their Notes.  In a recorded call that day, Highland expressed anger that RBC had not made sufficient efforts to get the deal done.  Highland said it thought the whole thing would happen once they had a "verbal agreement on price."  RBC agreed it thought

the deal would get done, but stated that, although they had an agreement on price it was "subject to just about everything [they] could possibly imagine."

What neither Highland nor RBC knew at that time was that the Schneiders would not sell the Notes because they had received insider information that could nearly double their value. Specifically, in early March, McNaughton, which was a publicly traded company, made the decision to notify the Schneiders that it was in merger discussions with Jones Apparel Group, a large apparel company. The information was communicated to the Schneiders through their lawyer on March 13, the day before RBC allegedly agreed to sell the Notes to Highland. The Schneiders' lawyer also told them if the merger occurred, they would likely be paid the full face value of the Notes. The merger discussions were successful and, as a result, on June 19, the Schneiders were paid $69 million, the full face value for all eight of their Notes.

In 2001, Highland filed suit against both the Schneiders and RBC in Texas state court. However, Highland nonsuited RBC after they agreed not to assert any claims against each other, and to toll limitations, until any claims they might have against the Schneiders were finally resolved. Highland's suit was then removed to federal court on grounds of diversity and transferred to the Southern District of New York.

In its suit against the Schneiders, Highland asserted both direct and third-party beneficiary contract claims. In its third-party action, Highland alleged RBC and the Schneiders entered into a contract for the sale of the Notes and that it was the intended beneficiary of that contract. After the Schneiders brought a third-party action against RBC, RBC counter-claimed against the Schneiders for breach of contract, also alleging the Schneiders agreed to sell it the Notes.

After several years of litigation,[5] a jury in that case found in favor of Highland and RBC. Specifically, it found the Schneiders' agent, Rauch, had entered into an enforceable agreement to sell the Notes to RBC and that Highland was an intended third-party beneficiary with respect to seven of the eight Notes. The jury awarded Highland and RBC over $40 million in actual damages. *Highland Capital Mgmt. LP v. Schneider*, 607 F.3d 322, 324, 327 (2d Cir. 2010), *cert. denied*, 562 U.S. 1200 (2011). However, the Second Circuit Court of Appeals reversed that judgment, concluding there was legally insufficient evidence to show Rauch had actual or apparent authority to agree to sell the Schneiders' Notes. *Id*. It remanded with instructions to enter judgment in favor of the Schneiders. *Id*. at 327.

In 2011, after that decision became final, Highland filed this suit against RBC, asserting RBC independently agreed to sell Highland the Schneiders' Notes, regardless of whether it was able to acquire them from the Schneiders. It sought the same damages it had sought in the Schneider trial.

At trial, Highland presented evidence that it and RBC agreed on "price and principal," which it asserted were the only essential terms to any securities trade. It asserted RBC was required to sell Highland the Notes for the agreed upon price and because RBC could not do so, it was required to pay Highland the difference between that price and their full face value. After

---

[5] That litigation had what the Second Circuit described as a "torturous" pretrial history. *Highland Capital Mgmt., LP v. Schneider*, 607 F.3d 322, 326 (2d Cir. 2010). It resulted in numerous opinions, including opinions from the federal district court, the Second Circuit and one from the New York Court of Appeals. *Id*; *Highland Capital Mgmt., LP v. Schneider*, 485 F.3d 690 (2d Cir. 2007); *Highland Capital Mgmt., LP v. Schneider*, 198 Fed. Appx. 41 (2d Cir. 2006); *Highland Capital Mgmt., LP v. Schneider*, 460 F.3d 308 (2d Cir. 2006); *Highland Capital Mgmt., LP v. Schneider*, 2008 WL 3884363 (S.D.N.Y. Aug. 20, 2008); *Highland Capital Mgmt., LP v. Schneider* 551 F.Supp.2d 173 (S.D.N.Y. 2008); *Highland Capital Mgmt., LP v. Schneider*, 533 F.Supp.2d 345 (S.D.N.Y. 2008); *Highland Capital Mgmt., L.P. v. Schneider*, 2005 WL 1765711 (S.D.N.Y. July 26, 2005); *Highland Capital Mgmt., LP. v. Schneider*, 379 F.Supp.2d 461 (S.D.N.Y. 2005); *Highland Capital Mgmt., LP v. Schneider*, 2004 WL 2029406 (S.D.N.Y. Sept. 9, 2004); *Highland Capital Mgmt., LP v. Schneider*, 8 N.Y.3d 406, 866 N.E.2d 1020 (2007).

hearing the evidence, the jury found in favor of Highland and awarded it $21.5 million in damages.  RBC appeals.

## Judicial Admissions and Judicial Estoppel

On appeal, RBC asserts no contract was formed as a matter of law.  Highland's primary response is that judicial estoppel and judicial admissions bar RBC from raising this complaint.  Specifically, Highland contends RBC's positions are inconsistent with judicial admissions and positions RBC previously took, and successfully maintained, at the Schneider trial.  To show what admissions and positions RBC took at the Schneider trial, Highland relies on the testimony of witnesses at that trial and arguments RBC's counsel made to the Schneider jury and in post-verdict filings in that case based on that testimony.

Although Highland generally cites the law on judicial admissions, it does not argue how any testimony of the witnesses or statements made by counsel constituted judicial admissions.  A judicial admission is a formal act of waiver of proof usually found in pleadings or the stipulations of the parties.  *Mendoza v. Fid. & Guar. Ins. Underwriters, Inc.*, 606 S.W.2d 692, 694 (Tex. 1980).  Regardless, in order to rely on judicial admissions on appeal, a party must object to the introduction of contrary evidence and to the submission of any issue bearing on the fact admitted.  *Houston First Am. Sav. v. Musick*, 650 S.W.2d 764, 769 (Tex. 1983) (to rely on judicial admissions, a party "must protect his record by objecting to the introduction of evidence contrary to that admission of fact and by objecting to the submission of any issue bearing on the fact admitted").

Here, Highland filed a pretrial motion seeking to have various statements RBC allegedly made in the Schneider trial declared as judicial admissions for purposes of this case.  The trial court, refusing to predetermine the issue, denied Highland's motion.  However, the trial court stated it would consider, at the appropriate time, whether RBC made any judicial admissions.

–9–

Highland did not later attempt to rely on judicial admissions. Therefore, it waived any error. *See* TEX. R. APP. P. 33.1(a).

Instead, Highland's primary complaint seems to rest on the similar, but distinct, doctrine of judicial estoppel. *See Holloway v. Holloway*, 671 S.W.2d 51, 59 (Tex. App.—Dallas 1983, writ dism'd) (explaining difference between judicial admissions and judicial estoppel). Before addressing Highland's judicial estoppel argument we first address the applicable law.

According to Highland, federal law applies because the prior statements were made in federal court. To support its claim, it relies on *Dallas Sales Co. v. Carlisle Silver Co.*, 134 S.W.3d 928, 931 (Tex. App.—Waco 2004, pet. denied). In that case, the Waco Court of Appeals held the federal law of judicial estoppel applied to prior statements made in federal bankruptcy court. In *Dallas Sales*, the Waco court applied federal law because that was the law applicable to the prior proceeding and because federal law would determine the preclusive effect of the judgment for purposes of res judicata. *See id*. This Court has also held that the federal law of judicial estoppel applies when a prior statement was made in federal bankruptcy court. *Cricket Commc'ns, Inc. v. Trillium Indus., Inc.*, 235 S.W.3d 298, 304 (Tex. App.—Dallas 2007, no pet.). We did so because of specific duties arising under the bankruptcy code. *Id.*

Here, Highland initially filed its suit against the Schneiders in Texas state court but it was removed to the Northern District of Texas on grounds of diversity. After removal, it was transferred to the Southern District of New York on the basis of convenience. *See* 28 U.S.C. § 1404(a). The federal court was not, therefore, applying federal substantive law. Further, because that court was sitting in diversity, federal law would not determine the preclusive effect of its judgment. *Semtek Int'l, Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001); *Madera Prod. Co. v. Atl. Richfield Co.*, 107 S.W.3d 652, 661 (Tex. App.—Texarkana 2003, pet. denied).

–10–

We conclude *Dallas Sales* does not support an application of federal law. Therefore, we apply Texas law.

According to Highland, RBC is judicially estopped from challenging whether a contract existed because its positions are inconsistent with positions it took in the Schneider trial. However, it is unclear whether Highland is contending the trial court should have invoked the doctrine in the proceedings below or whether this Court should invoke the doctrine for purposes of appeal. Because Highland does not direct us to any ruling of the trial court that it contends was erroneous, it appears Highland is making the latter assertion. We nevertheless note that at trial, Highland asserted it was entitled to judgment as a matter of law on its contract claim based on the doctrine of judicial estoppel. By doing so, Highland sought to utilize the doctrine not as a defense, but as a sword, seeking to substitute RBC's positions in the Schneider trial for evidence to support a $21.5 million judgment. *See, e.g., Shea v. Clinton*, 880 F.Supp.2d 113, 119 (D.D.C. 2012) (applying judicial estoppel to give plaintiff shortcut to relief would be manifestly unjust); *Ryan Operations G.P. v. Santiam–Midwest Lumber Co*., 81 F.3d 355, 365 (3d Cir. 1996) ("Judicial estoppel is not a sword to be wielded by adversaries unless such tactics are necessary to secure substantial equity."); *State of W.Va. v. Moore*, 897 F. Supp. 276, 281 (S.D.W. Va. 1995) (allowing plaintiff to use judicial estoppel to prove case would be unfair); *see also Yarber v. Pennell*, 443 S.W.2d 382 (Tex .Civ. App.—Dallas 1969, writ ref'd n. r. e.) (judicial estoppel is normally invoked against a plaintiff, but may be used to preclude assertion of an affirmative defense).

Nor has Highland cited this Court to any authority that would allow us, as a court of review, to invoke the doctrine to preclude RBC from challenging the trial court's judgment. The federal circuit courts have done so, but under different circumstances. *See, e.g., Huffman v. Union Pac. R.R*., 675 F.3d 412, 418 (5th Cir. 2012) (in egregious cases, a judicial estoppel

–11–

argument may be raised for the first time on appeal); *Kaiser v. Bowlen*, 455 F.3d 1197, 1204 (10th Cir. 2006) (appellate court has discretion to invoke judicial estoppel); *Beall v. United States*, 467 F.3d 864, 870 (5th Cir. 2006) (same).

Nevertheless, even if judicial estoppel can be used offensively and even if this Court has the power to invoke the doctrine, judicial estoppel is inapplicable to this case. As a general matter, judicial estoppel precludes a party who successfully maintains a position in one proceeding from afterwards adopting a clearly inconsistent position in another proceeding to obtain an unfair advantage. *Pleasant Glade Assembly of God v. Schubert*, 264 S.W.3d 1, 6 (Tex. 2008). In Texas, the elements of judicial estoppel are: (1) a sworn, prior inconsistent statement made in a judicial proceeding; (2) which was successfully maintained in the prior proceeding; (3) not made inadvertently or by mistake, or pursuant to fraud or duress; and (4) which is deliberate, clear, and unequivocal. *Nine Syllables, LLC v. Evans*, No. 05-13-01677-CV, 2015 WL 3932751, at *4 (Tex. App.—Dallas June 26, 2015, no pet.); *DeWoody v. Rippley,* 951 S.W.2d 935, 944 (Tex. App.—Fort Worth 1997, no writ).

The essential function of judicial estoppel "is to prevent the use of intentional self-contradiction as a means of obtaining unfair advantage." *Pleasant Glade Assembly of God,* 264 S.W.3d at 6 (citing *Andrews v. Diamond, Rash, Leslie & Smith*, 959 S.W.2d 646, 650 (Tex. App.—El Paso 1997, writ denied)); *see also Hall v. GE Plastic Pac. PTE Ltd.*, 327 F.3d 391, 396 (5th Cir. 2003) (noting basis for estoppel is the assertion of a position clearly inconsistent with a previous position accepted by the court); *Tenneco Chem., Inc. v. William T. Burnett & Co.*, 691 F.2d 658, 665 (4th Cir. 1982) (finding "the determinative factor is whether the appellant intentionally misled the court to gain an unfair advantage"). Thus, the doctrine does not apply unless a party gains an unfair advantage from the asserted inconsistency. *Ferguson v. Bldg. Materials Corp. of Am.*, 295 S.W.3d 642, 643 (Tex. 2009); *Pleasant Glade Assembly of God*,

264 S.W.3d at 6.  Therefore, a party cannot be judicially estopped if it did not prevail in the prior action.  *Ferguson*, 295 S.W.3d at 643; *Long v. Knox*, 155 Tex. 581, 291 S.W.2d 292, 295 (1956).

Here, Highland asserts that RBC is estopped from denying a contract was formed in this case because RBC's arguments are inconsistent with arguments it successfully maintained at the Schneider trial.  Highland asserts RBC successfully maintained its arguments in that case because it obtained a judgment against the Schneiders.  However, the Second Circuit reversed that judgment and remanded to the district court with instructions to enter judgment in favor of the Schneiders.

According to Highland, RBC's temporary success in maintaining its position is sufficient to invoke the doctrine of judicial estoppel.  It relies on *Allgood v. GlaxoSmithKline PLC*, CIV.A. 06-3506, 2008 WL 483574 (E.D. La. Feb. 20, 2008), *aff'd sub nom*, 314 Fed. Appx. 701 (5th Cir. 2009), a case decided on a point of federal law which is in direct conflict with Texas law.  In *Allgood*, the court held the plaintiffs successfully maintained a prior position when they obtained a judgment based on that position, even though that judgment was later reversed.  *Id*. at *8.  The court reasoned that a party need not prevail on the merits for judicial estoppel to apply and that it applies even to preliminary matters.  *Id.*  In contrast, in Texas, judicial estoppel applies only if a party prevailed in the action, and it does not apply to positions taken in the same suit.  *Ferguson*, 295 S.W.3d at 643.  Additionally, judicial estoppel does not apply unless a party gains an unfair advantage by the inconsistency.  *See id*.; *Pleasant Glade Assembly of God*, 264 S.W.3d at 6. Here, RBC did not prevail in the prior action and gained no advantage or benefit from allegedly changing its position.  Judicial estoppel is not applicable.

### Existence of a Contract

In its first issue, RBC asserts, as a matter of law, no contract was formed for the sale of the Notes.  The parties agree New York law applies to this dispute.

–13–

"[T]he fundamental basis of a valid, enforceable contract is a meeting of the minds of the parties." *Schurr v. Austin Galleries of Ill.*, *Inc.*, 719 F.2d 571, 576 (2d Cir. 1983). To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms. *In re Express Indus. & Terminal Corp. v. NY State Dep't of Transp.*, 93 N.Y.2d 584, 589-90, 715 N.E.2d 1050, 1053 (1999). Generally, courts look to the basic elements of the offer and the acceptance to determine whether there is an objective meeting of the minds sufficient to give rise to a binding and enforceable contract. *Express Indus. & Terminal Corp.*, 93 N.Y.2d at 589.

A plaintiff may meet its burden by showing it made an offer that included all the essential and material terms of the offer and that the defendant accepted that offer. *Kowalchuk v. Stroup*, 61 A.D.3d 118, 121-22, 873 N.Y.S.2d 43, 46−47 (2009). A series of communications between the parties may also show a contract was formed if the communications were "sufficiently clear and concrete" to show the parties' intent to enter into a binding agreement. *Brighton Inv., Ltd. v. Har–Zvi*, 88 A.D.3d 1220, 1222, 932 N.Y.S.2d 214, 216 (2011).

In determining whether parties' communications formed a contract, we do not consider their subjective intent. *Brown Bros. Elec. Contractors. v. Beam Constr. Corp.*, 41 N.Y.2d 397, 399–400 (1977). Rather, we consider the objective manifestation of the parties' intent as expressed by their words and deeds. *Id*. This is because a "contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent." *See Hotchkiss v. Nat'l City Bank of NY*, 200 F. 287, 293 (S.D.N.Y. 1911) (J. Hand), *aff'd*, 201 F. 664 (2d Cir.), *aff'd*, 231 U.S. 50 (1913).

A contract also requires mutual intent to be bound. *Highland Capital Mgmt., LP v. Bank of Am. Nat'l Ass'n*, 698 F.3d 202, 206 (5th Cir. 2012). If the parties to an agreement do not intend to be bound to an oral agreement until it is reduced to a writing, they are not bound until

that time.  *Powell v. Omnicom*, *BBDO/PHD*, 497 F.3d 124, 129−30 (2d Cir. 2007).  In the absence of a writing, New York law imposes a particularly heavy burden on a plaintiff to establish objective signs of the parties' mutual intent to be bound.  *See Winston v. Mediafare Entm't Corp*., 777 F.2d 78, 80 (2d Cir. 1985).  The burden is heavier in oral agreements because "[a] primary concern for courts in such disputes is to avoid trapping parties in surprise contractual obligations that they never intended."  *Teachers Ins. & Annuity Assoc. of Am. v. Tribune Co*., 670 F.Supp. 491, 497 (S.D.N.Y. 1987).

### Application

Highland sued RBC for breach of contract based on an oral agreement in which RBC allegedly agreed to sell Highland the Schneiders' Notes.  Whether such a contract exists depends upon whether there was a manifestation of mutual assent sufficiently definite to establish the parties were in agreement as to all material terms of the alleged contract.  *Brown Bros. Elec*., 41 N.Y.2d at 399.  In making this determination, we look to the objective manifestations of Highland and RBC's intent as shown by their expressed words and deeds.  *Id*.

Despite this objective standard, Highland made little effort to prove the particular oral communications that formed the contract.  Instead, its position was, in essence, that it was only required to show the parties reached an agreement on price and principal because those are the only essential terms to a trade.  However, New York law dictates we review the parties' expressed words and deeds to determine whether a contract was formed.

 Here, the only evidence of the parties' manifested intent consists of oral communications which were recorded and Wood's testimony at the Schneider trial.  There are no disputed issues of fact with respect to those communications. *See Vacold LLC v. Cerami*, 545 F.3d 114, 123 (2d Cir. 2008) (question of contract formation is a question of law when there is no dispute as to whether particular communications were sent, whether particular words were uttered, or whether

–15–

particular conduct occurred); *Cortland Asbestos Prods, Inc. v. J. & K. Plumbing & Heating Co.*, 33 A.D.2d 11, 12, 304 N.Y.S.2d 694, 696 (3d Dep't 1969) ("[W]hile the existence of a contract is a question of fact, the question of whether a certain or undisputed state of facts establishes a contract is one of law for the courts...."); *see also Four Seasons Hotels, Ltd. v. Vinnik*, 127 A.D.2d 310, 317, 515 N.Y.S.2d 1, 6 (1st Dep't 1987).

Here, Highland's communications are clear. Its offer to purchase the Notes was subject to numerous conditions, including a written trade confirmation, representations from the Schneiders, a representation from McNaughton, and settlement by the end of the month. Neither the documentation, the representations, nor the timing were standard. Highland's communications further reveal its conditions were essential. Specifically, Highland made clear it would not agree to purchase the Notes if its conditions were not satisfied. It is undisputed that RBC *did not agree* to its conditions. In fact, RBC *could not agree* to those conditions because they required the Schneiders' agreement.

Notwithstanding these communications, Highland asserts a binding contract was formed obligating it to purchase the Notes when the parties agreed on price and principal. According to Highland, the conditions it attached to its offer were not essential to the trade.

Instead of directing us to any communications to support its contention, it relies on expert testimony. Specifically, Highland's expert, Adam Warren, testified that the only essential terms to a trade are price and principal. Warren testified that the moment an agreement on price and principal is reached, a trade occurs setting the trade date, and market risk shifts from the seller to the buyer.[6] He testified that any remaining issues that have to be negotiated or worked out occur in the settlement process, which happens after a trade.

_____

[6] Stating market risk shifts on the trade date is just another way of saying agreements on price and principal are binding when made. It is therefore, in effect, a legal conclusion. *See Hotchkiss*, 200 F. at 294 (expert's opinion as to legal effect of industry custom is incompetent).

On appeal, RBC asserts notwithstanding Warren's testimony or industry custom, no contract was formed in this case because terms these parties deemed essential to their bargain remained to be negotiated. *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 109-10, 417 N.E.2d 541, 543-44 (1981). We agree.

Although industry custom may show the meaning of the parties' words or deeds, it may not be used to vary the expressed intentions of the parties. *See Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528 (2d Cir. 1985); *Croce v. Kurnit*, 737 F.2d 229, 238 (2d Cir. 1984). Nor can industry custom create an intent to be bound. *Tri-County Motors, Inc. v. Am. Suzuki Motor Corp.*, 301 Fed. Appx. 11, 13 (2d Cir. 2008). Furthermore, expert testimony cannot be used to usurp the court's function by giving an opinion as to the legal effect of an industry custom. *See Hotchkiss*, 200 F. at 294; *Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 181 (S.D.N.Y. 2008) (an expert may opine on an issue of fact within the jury's province, but he may not give testimony stating ultimate legal conclusions based on those facts). Even if an expert's testimony is "couched in terms of industry practices," he may not, under any circumstances, opine on the ultimate legal issue in the case. *Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 181 (S.D.N.Y. 2008) (citing *Media Sport & Arts s.r.l.*, 95 CIV. 3901 (PKL), 1999 WL 946354, at *1 (S.D.N.Y. Oct. 19, 1999)).

As noted, Highland's expressed communications were clear. Its offer to purchase the Notes was conditioned on written documentation, representations, and a short settlement. These conditions were never satisfied or agreed upon, but remained to be negotiated. Highland, nevertheless, asserts that because the conditions all concerned settlement issues, and settlement occurs after a trade, they were not essential terms of the trade. However, Highland sued RBC for breaching a contract in which Highland agreed to purchase and RBC agreed to sell the Schneiders' Notes. Highland specifically alleged RBC breached the contract by failing to *deliver*

the Notes.  *See John Wood Group USA, Inc. v. ICO, Inc*., 26 S.W.3d 12, 20 (Tex. App.—Houston [1st Dist.] 2000, pet. denied) (essential element of a sale includes consent to deliver good for agreed upon price).  Therefore, regardless of whether Highland conditioned its offer on issues that related to the trade date or issues that related to the settlement date, the conditions were part of the contract it alleged.

Highland's other evidence consisted almost entirely of the parties' subjective beliefs.  For example, Highland contends it merely requested representations from the Schneiders and requested to close by the end of the month.  However, Highland's "after-the-fact professed subjective intent" is irrelevant in determining whether a contract was formed, especially where that professed intent is inconsistent with the words it expressed to RBC at the time of the contract.  *See Winkler v. Kingston Hous. Auth*., 259 A.D.2d 819, 823, 686 N.Y.S.2d 513, 517 (1999).

We conclude the parties did not enter into a contract for the sale of the Notes at the time they agreed on price and principal.  Rather, other terms and conditions deemed essential to the parties remained to be negotiated.  "Few principles are better settled in the law of contract than the proposition that, 'If a material element of a contemplated contract is left for future negotiations, there is no contract . . . .'"  *Willmott v. Giarraputo*, 5 N.Y.2d 250, 253, 157 N.E.2d 282, 283 (1959).  Because the parties did not agree to all matters they deemed material to an agreement for the sale of the Notes, we conclude no contract was formed.  *Four Seasons Hotels Ltd.*, 127 A.D.2d at 317 (there is a contract if the matters left open were not deemed material by the parties, and there is no contract if the matters left open were deemed material).

We also agree with RBC that Highland failed to show the parties intended to be bound by their oral agreement.  A contract requires not only mutual assent to all material terms, but also mutual intent to be bound by that agreement.  *Zheng v. City of NY,* 19 N.Y.3d 556, 564, 976

N.E.2d 711 (2012); *see also Bank of Am. Nat'l Ass'n*, 698 F.3d at 206 (applying New York Law).  Whether the parties intended to be bound only by a formal writing is a generally a question of fact.  *Chromalloy Am. Corp. v. Universal Hous. Sys. of Am., Inc*., 495 F. Supp. 544, 550 (S.D.N.Y. 1980), *aff'd*, 697 F.2d 289 (2d Cir. 1982).  But if the facts are undisputed, and they support only one conclusion, the issue is a question of law.  *Id; see also Bank of Am. Nat'l Assoc.*, 698 F.3d at 206 (summary judgment proper on breach of contract claim when no evidence of intent to be bound to oral agreement); *see also Chromalloy Am. Corp.*, 495 F. Supp. at 550; *Brighton Inv., Ltd*., 88 A.D.3d at 1223.

As noted, under New York law, a plaintiff seeking to enforce an oral contract "has a particularly heavy burden to establish objective signs of the parties' intent to be bound."  *N.F.L. Ins. Ltd. by Lines v. B & B Holdings, Inc*., 874 F.Supp. 606, 613 (S.D.N.Y. 1995); *see also Winston v. Mediafare Entm't Corp*., 777 F.2d 78, 80 (2d Cir. 1985).  In determining whether parties intended to be bound in the absence of a writing, we consider the following factors: (1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing.  *Winston*, 777 F.2d at 80; *see also Powell*, 497 F.3d at 129−30; *Ciaramella v. Reader's Digest Ass'n, Inc.*, 131 F.3d 320, 323 (2d Cir.).  The first factor, the language of the agreement, is the most important.  *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 72 (2d Cir. 1989).

Here, when Highland offered to purchase the Notes, it made its offer "subject to docs." Likewise, when RBC told Highland they had an agreement on "price and principal," it specifically stated its acceptance was "subject to docs."  It is undisputed that among the docs the

–19–

parties were referencing were a written trade confirmation and a purchase agreement, assigning the Notes to Highland.

Even before the parties agreed on price, Highland referenced language it wanted in the docs and hired an attorney to start working on the documentation. Immediately after the parties reached an agreement on price, Highland sent RBC a draft trade confirmation that included provisions that remained to be negotiated.

Evidence that an oral agreement was expressly made "subject to documentation" as well as other conditions, evidences the parties did not intend to be bound in the absence of a written agreement. *See Highland Capital Mgmt., LP v. Bank of Am., N.A.,* 574 Fed. Appx. 486, 488 (5th Cir. 2014); *In re Lyondell Chem. Co.*, 491 B.R. 41, 56 (Bankr. S.D.N.Y. 2013), *aff'd*, 505 B.R. 409 (S.D.N.Y. 2014) (evidence that an agreement was subject to specific documentation "strongly compel[s] a conclusion that binding contractual relations did not come into being before definitive documentation was drafted and executed."). Here, both Highland's offer and RBC's acceptance were specifically made "subject to documentation." Most significantly, Highland admitted one of those documents was a written trade confirmation, the document that actually confirms the trade. The documentation the parties were referencing was not standard documentation. It had to be negotiated. Therefore, at the time of their agreement, the parties expressed it was subject to negotiating a written trade confirmation.

We also conclude the remaining factors show the parties did not intend to be bound until a writing was executed. Neither party partially performed in a manner that would suggest they were bound without a writing, and, after reaching an agreement on price, Highland sent RBC a *draft* trade confirmation that was not a memorialization of the trade or prior agreements, but included the terms that remained to be negotiated. *Cf. Schutty v. Speiser Krause P.C.*, 86 A.D.3d 484, 485, 928 N.Y.S.2d 4 (2011) (evidence parties exchanged draft written agreements

after oral agreement reflected they did not intend to be bound until there was a written agreement).

We also reject Highland's contention that it showed the agreement it is seeking to enforce is the type that is generally binding in the absence of a writing. Highland relies on evidence that oral agreements to trade securities are generally binding when made, even when subject to documentation. However, Highland concedes that it is standard practice that documentation has to be negotiated when *these* types of securities are traded.[7] Considering all of these factors, we agree with RBC that the parties did not intend to be bound in the absence of a writing.

Because the record fails to show either mutual assent or mutual intent to be bound, we conclude no contract was formed. Therefore, we reverse the trial court's judgment and render judgment that Highland take nothing on its claim.

/Ada Brown/
_____
ADA BROWN
JUSTICE

130948F.P05

---

[7] In the New York litigation, it was initially unclear whether the Notes were securities at all such to be exempted from that state's statute of frauds. The district court initially held they were not securities and therefore any oral agreement to sell them was only enforceable up to $5000. *Highland Capital Mgmt., LP v. Schneider*, 2005 WL 1765711, at *17 (S.D.N.Y. July 26, 2005). On appeal to the Second Circuit, it certified the question to the New York Court of Appeals because New York law was unsettled. *Highland Capital Mgmt., LP v. Schneide*r, 460 F.3d 308, 316 (2d Cir. 2006). That Court concluded, with two justices dissenting, that the Notes were securities and were not subject to the state's statute of frauds. *Highland Capital Mgmt., LP v. Schneider*, 8 N.Y.3d 406, 866 N.E.2d 1020 (2007).



## Court of Appeals
## Fifth District of Texas at Dallas
## JUDGMENT

RBC CAPITAL MARKETS, LLC,
Appellant

No. 05-13-00948-CV     V.

HIGHLAND CAPITAL MANAGEMENT,
L.P., Appellee

On Appeal from the 95th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-11-02034-D.
Opinion delivered by Justice Brown. Justices
Evans and Schenck participating.

     In accordance with this Court's opinion of this date, the judgment of the trial court is
**REVERSED** and judgment is **RENDERED** that HIGHLAND CAPITAL MANAGEMENT,
L.P. take nothing.

     It is **ORDERED** that appellant RBC CAPITAL MARKETS, LLC recover its costs of
this appeal from appellee HIGHLAND CAPITAL MANAGEMENT, L.P..

Judgment entered this 4th day of December, 2015.